IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROBERT BOSLEY,

    Plaintiff,

  v.

METROPOLITAN LIFE INSURANCE COMPANY,

    Defendant.

No. C 16-00139 WHA

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## INTRODUCTION

Plaintiff in this ERISA action contends that defendant insurer erred in denying his claim for long-term disability benefits. This order agrees in part based upon findings of fact and conclusions of law after a one-day bench trial, as set forth below.

## PROCEDURAL HISTORY

Plaintiff Robert Bosley worked for non-party Kaiser Permanente from 2006 to 2013. He enrolled in Kaiser's ERISA plan, which included a long-term disability insurance policy issued by defendant Metropolitan Life Insurance Company ("MetLife"). Bosley previously claimed, and MetLife approved, long-term disability benefits in 2009 and 2011. Benefits from those claims terminated in 2010 and 2012, respectively, when Bosley returned to work in less demanding positions. In 2014, Bosley submitted a third claim for long-term disability benefits based on chronic fatigue syndrome. MetLife denied that claim and Bosley's subsequent appeal.

Bosley filed the instant action in January 2016. Both sides agreed to de novo review and moved for summary judgment. A prior order denied MetLife's motion because MetLife "failed to explain why it rejected Bosley's subjective complaints," noting that, "Ordinarily, it would be appropriate to remand this action to MetLife to reevaluate Bosley's claims, now directed to consider his subjective complaints and the assessments thereof" (Dkt. No. 38 at 7–8). Bosley, however, requested further discovery of his claim files from 2009 and 2011 to show that MetLife "paid the prior claims on essentially the same basis" as that asserted for his 2014 claim, to "provide additional evidence of inconsistent positions taken by MetLife . . . as well as further evidence of [his] disability," and to provide "evidence of MetLife's breach of fiduciary duty" (*see* Dkt. No. 34 at 3). The Court granted Bosley's request and held his motion for summary judgment in abeyance (Dkt. No. 38 at 8).

After MetLife produced the 2009 and 2011 claim files, Bosley renewed his motion for summary judgment, urging against remand and suggesting a bench trial "[i]n the event the Court does not see its way clear to granting summary judgment" (Dkt. No. 39 at 7–8). A subsequent order denied Bosley's motion, noting that "there are significant differences between Bosley's 2009, 2011, and 2014 claims," and "Bosley was and remains wrong . . . in representing that MetLife previously approved his long-term disability claims based on the same medical record as in the 2014 claim" (Dkt. No. 54 at 3). That order agreed, however, that a bench trial was preferable to remand under these circumstances (*id.* at 5).

Bosley had aged out of his eligibility for benefits as of July 29, 2016, effectively capping the amount of benefits at issue in this case (Dkt. Nos. 57 at 2; 65 at 10). Both sides therefore requested that the bench trial proceed solely on the "closed administrative record" (Dkt. No. 57 at 2). They disagreed, however, as to the scope of that record. When the Court tried to clarify the issue at the final pretrial conference, both sides reaffirmed their agreement that this case should be decided on the administrative record alone. Counsel for MetLife maintained that the prior claim files from 2009 and 2011 did not belong in the record but nevertheless agreed that the Court could review those files in making its decision. This case was thus submitted on a closed record consisting of Bosley's claim files from 2009, 2011, and

2014, except that both sides submitted a joint pretrial statement with stipulated facts, submitted separate proposed findings of fact and conclusions of law, and presented closing argument.[*]

Stipulated facts and any proposed finding of fact expressly agreed to by the opposing side at least in part shall be deemed adopted to the extent agreed upon, even if not expressly adopted herein. Citations to the record herein are provided only as to particulars that may assist the court of appeals. All declarative statements herein are factual findings.

## STATEMENT OF FINDINGS OF FACT

1. MetLife's policy provided in relevant part that a participant in Kaiser's ERISA plan is disabled if (AR 59):

> (a) during the 90-day elimination period and the next 24 months, the participant is "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue [their] Usual Occupation in the usual and customary way" (the "own occupation" provision), or
>
> (b) after the elimination period plus 24 months, the participant is unable "to engage with reasonable continuity in any occupation in which [they] could reasonably be expected to perform satisfactorily in light of [their] age, education, training, experience, station in life, and physical and mental capacity" (the "any occupation" provision).

The policy also defined "Substantial and Material Acts" as (AR 60):

> [T]he important tasks, functions and operations generally required by employers from those engaged in [the participant's] Usual Occupation that cannot be reasonably omitted or modified. In determining what substantial and material acts are necessary to pursue [the participant's] Usual Occupation, [MetLife] will first look at the specific duties required by [the participant's] job. If [the participant is] unable to perform one or more of these duties with reasonable continuity, [MetLife] will then determine whether those duties are customarily required of other employees engaged in [the participant's] Usual Occupation.

Finally, the policy defined "Usual Occupation" as (*ibid.*):

---

[*] In his pretrial materials, plaintiff also requested an equitable surcharge of $31,473.29 based on an alleged "direct relationship between MetLife's acts and omissions and the necessity of plaintiff incurring [expenses] to move from California to Missouri" (Dkt. No. 65). The undersigned judge had proposed accepting extra-record evidence in this case, but both sides objected. The sole evidentiary support for plaintiff's request thus came from his own written declaration submitted earlier in this litigation (Dkt. No. 40). Since that declaration was ultimately not made a part of the trial record at the final pretrial conference, plaintiff's request for an equitable surcharge was withdrawn.

3

> [A]ny employment, business, trade or profession and the Substantial and Material Acts of the occupation [the participant was] regularly performing for the employer when the Disability began. Usual Occupation is not necessarily limited to the specific job that [the participant] performed for the employer.

2. In 2007, after an extensive work-up that ruled out many other diagnoses, the Veterans Administration diagnosed Bosley with chronic fatigue syndrome.

3. In January 2009, while working in an efficiency nurse position classified as "very heavy" by MetLife, Bosley filed a claim for long-term disability benefits with an onset date in August 2008. Following a clinical assessment of medical records submitted in support of that claim, MetLife agreed that Bosley "could not perform any job duties due to a combination of conditions," including hypertension and "caregiver stress causing a flare of his chronic fatigue syndrome," which included symptoms like "sometimes sleeping all day, panic attacks, and daily migraines." Because the foregoing constituted disability as defined by the policy, MetLife approved Bosley's claim for long-term disability benefits.

4. In March 2009, MetLife began following up with Bosley to see when he would return to work. Bosley repeatedly postponed returning to work until late August of 2009. In the interim, MetLife obtained updated medical records from Bosley showing that he continued to seek treatment for various health problems, including possible obstructive sleep apnea, gastroesophageal reflux disease, vision problems, back pain, stress, anxiety, and depression. It also included multiple notes from Dr. Pham indicating that Bosley did not feel ready to work and postponing his return to work. In assessing these medical records, MetLife noted that multiple symptoms impacted Bosley's response to treatment, and that depression and obstructive sleep apnea both impacted symptoms of chronic fatigue syndrome.

5. In late August of 2009, Bosley returned to work but, per Dr. Pham's recommendation, worked only three eight-hour shifts per week. In December 2009, MetLife again reviewed Bosley's updated medical records and determined that it was reasonable for him to gradually return to work with increased hours to build up stamina given his chronic condition.

6. In March 2010, MetLife began investigating to determine if Bosley's medical records supported a finding of continued disability under the "any occupation" provision of the Plan,

4

*i.e.*, beyond the elimination period plus 24 months. Bosley's updated medical records continued to reflect a laundry list of health problems, including chronic fatigue syndrome, depression, hypertension, and migraines. Bosley also continued to submit subjective complaints of chronic fatigue, low energy, and sadness. MetLife determined that Bosley's medical records supported continuing his reduced work schedule but did not support a finding of no work capacity. MetLife also specifically sought information regarding whether Bosley's comorbid conditions continued to affect his functionality.

7. In May 2010, MetLife terminated Bosley's long-term disability benefits because he had returned to work full-time.

8. In June 2011, while working in a staff nurse position classified as "sedentary" by MetLife, Bosley filed a second claim for long-term disability benefits. Following a clinical assessment of medical records submitted in support of that claim, MetLife again agreed that Bosley was disabled under the policy terms, noting that he had been hospitalized and underwent several procedures in connection with a gastrointestinal tumor. It therefore approved his claim for long-term disability benefits.

9. Throughout the remainder of 2011 and most of 2012, MetLife continued to ask Bosley for updates on his condition and expected return-to-work date. Bosley indicated that he did not feel ready to return to work, citing his chronic fatigue syndrome as the primary cause. In August 2012 he began making efforts to return to work. By March 2013 he had apparently returned to work in a different position at Kaiser.

10. In January 2014, Bosley filed a new claim for long-term disability benefits with an onset date of October 31, 2013, based on chronic fatigue syndrome. At the time, he worked as an advice nurse. Although classified as "sedentary" by MetLife, the occupation required the ability to, among other things, "work in a fast-paced environment" and "assess and triage patients via telephone" (AR 282). In support of his claim, Bosley submitted medical records from Dr. David Jesse Zollinger, his treating physician at Kaiser. Dr. Zollinger had seen Bosley on November 4, 2013, and placed him off work through December 2, 2013, for "uncontrolled symptoms" of chronic fatigue syndrome. On November 25, 2013, Dr. Zollinger extended

5

Bosley's off-work time through March 1, 2014. On January 27, 2014, at Bosley's request, Dr. Zollinger again extended his off-work time through May 3, 2014. At each visit, Dr. Zollinger reported that Bosley was "well appearing, in no acute distress." He also recorded specific complaints from Bosley, including, for example, that he spent "15–18 hours in bed" per day, would be "confined to bed for 1–2 days" following "chores around the house," and could "occasionally post something on ebay but [would be] exhausted after an hour" (AR 338, 345).

11. In March 2014, MetLife sent Bosley's claim file to its medical director, Dr. David Peters, for review. Dr. Peters reviewed Bosley's medical records but never spoke with Bosley or examined him in person. Dr. Peters acknowledged Dr. Zollinger's notes concerning Bosley's subjective complaints, including that he suffered from daily headaches and unrefreshing sleep, spent 15–18 hours in bed on some days, and found that the stress from "listening to other people's problems" as an advice nurse triggered his fatigue. Nevertheless, Dr. Peters dismissed the symptoms observed by Dr. Zollinger and opined that, while Bosley's history comported with his longstanding diagnosis of chronic fatigue syndrome and he had a history of "exacerbations," his new complaints were "subjective without significant physical findings." For example, Bosley reported only "mild" daily headaches, had no abnormal musculoskeletal findings, and took no medications other than Prozac. Dr. Peters also noted that Bosley could care for his five dogs but did not discuss how he took into account Bosley's claim that just walking his dogs to the back yard was "exhausting." Additionally, Dr. Peters noted that Bosley had received no referrals for further treatment with respect to rehabilitation, pain management, physical therapy, or mental health. The foregoing factors, combined with the lack of "physical demand" in Bosley's job, led Dr. Peters to conclude that Bosley could continue full-time work at his job with some accommodations. Specifically, Dr. Peters opined that Bosley should not be required to work overtime and further recommended (AR 295):

> In addition to standard morning, afternoon and lunch breaks, he should be allowed 2–3 minute periods at least every hour to stand and stretch if needed for comfort. Due to consistent complaints of fatigue, lifting/carrying and pushing/pulling should be limited to 10 pounds or less occasionally. Constant repetitive upper extremities activities at waist/desk level should be possible. He should not be required to climb ladders and standing/walking should be limited to 20 minutes per hour and to 2.5 hours daily.

Dr. Peters also opined that Bosley could experience "mild to moderate improvement" of his chronic fatigue "with reconditioning" (*ibid.*).

12. Dr. Zollinger responded to Dr. Peters's review. He agreed that Bosley's condition was "mostly subjective" but noted that chronic fatigue syndrome "is not associated with [any] confirmatory labs or other functional tests." He further explained that he had not referred Bosley for further rehabilitative treatment because, given the "long term nature of his condition" and previous unsuccessful treatment attempts, they "did not feel it would help." Dr. Zollinger also pointed out in response to Dr. Peters's "reconditioning" recommendation that previous efforts to physically "recondition" Bosley had also been unsuccessful due to his "limitation in energy level." Additionally, "pain management [had] not been considered" because pain had not been a "major factor" for Bosley. Dr. Zollinger concluded (AR 271):

> I would suggest that in determining [Bosley's] work limitations, this pattern of extreme exhaustion in response to stress limits him in doing any work as an Advice RN. The limitations recommended by Dr. Peters have been attempted per patient report and resulted in long periods of excessive fatigue precluding work.

13. In April 2014, MetLife accepted Dr. Peters's analysis and denied Bosley's claim on the grounds he articulated. The denial letter summarized the opinions of Drs. Zollinger and Peters and explained, "While we did consider Dr. Zollinger's response and the history of your condition is acknowledged, we did not feel that the response contained any significant/new clinical information that would require further review or impact the medical director's original report." The denial letter concluded, "when comparing your physical job demands to the functional abilities that the medical director indicated that you should be able to sustain, it appears that you would be able to perform the duties of your Usual Occupation in the Usual and Customary Way" (AR 266, 268).

14. In May 2014, Bosley appealed MetLife's denial of his claim. He provided a written statement detailing his own experience with his symptoms, as well as supporting statements from two friends and coworkers who offered their own accounts of the negative impacts of chronic fatigue syndrome on his functionality. Alison Won, who had worked many shifts together with Bosley, noted that his chronic fatigue syndrome had flared up in the "past several

7

years, most notably in the past several months," and that he had been unable to engage in activities he previously enjoyed "because of his poor stamina and lack of energy." She also commented on his "sporadic sleep patterns," declining health, and the fact that he "[had] always been a hard worker ever since [she had] known him" (AR 193). Similarly, Melani Meeker, another advice nurse, claimed that Bosley's chronic fatigue syndrome "threaten[ed] his ability to function safely and effectively as a nurse even in this physically sedentary job." Significantly, she described the job as one that "require[d] constant alertness and critical thinking as patients call for any number of reasons including those for which [advice nurses] must make instant life or death decisions," and stated, "Although this job . . . does not require extensive physical activity, the amount of stress placed on [advice nurses] far outweighs any physical stresses." This description comported with Bosley's own subjective complaints that his job was stressful. Meeker also described Bosley's inability to perform "everyday tasks" like making calls, getting out of bed, bathing, preparing meals, and grocery shopping (AR 194).

15. Bosley also informed MetLife in his appeal that he had left Dr. Zollinger's care to resume treatment at the Veterans Administration with Dr. Katherine Wysham. Dr. Wysham had given Bosley a medical leave note that stated he was "disabled" from chronic fatigue syndrome and added (AR 216):

> I have just begun caring for this patient and [agree that] he is currently incapacitated from his chronic fatigue and cannot work. Although he sits at his job, it is a high stress job which is a trigger for his disease. . . . As he cares for patients during his job, the mental fatigue interferes with the ability [to] triage potentially critically ill patients. I would like for him to have 3 months of medical leave from work (5/3/2014–8/3/2014). In that time he will continue to [work with] mental health, [physical therapy] and with myself in order to [improve his] functioning.

Before issuing her medical leave letter, Dr. Wysham had referred Bosley for, among other things, mental health assessment, noting, "Needs ongoing motivational interviewing and to show that he is working with mental health in order to continue to receive work excuse letters from me." Subsequent notes from mental health observed that Bosley "stated that he is not interested in psychotherapy or further mental health treatment at this time, displaying low

8

motivation for change." He was also "[d]ealing with long-term disability process, and is aware that they need evidence that his issues are being addressed" (AR 206).

16. MetLife sent Bosley's appeal to a physician consultant, Dr. Marcus Goldman, for independent review. Dr. Goldman, a specialist in psychiatry, reviewed Bosley's medical records and claim documentation but never spoke with him or examined him in person. Dr. Goldman concluded that Bosley's claim did not support functional limitations beyond November 1, 2013, citing the lack of medical records showing "severe psychopathology or functional impairment as a result of a diagnosed mental disorder," lack of evidence "of treatment in more intense levels of care," lack of "psychiatric signs typically associated with limitations," and Bosley's own lack of interest in "dedicated mental health treatment" (AR 172–75). After speaking with Dr. Wysham, Dr. Goldman also submitted an addendum reaffirming his prior opinion because Bosley exhibited "no overt or outward manifestations of a major mental illness," and the "intensity of [his] treatment continue[d] to be inconsistent with a major mental disorder" (AR 180).

17. MetLife also sent Bosley's appeal to an infectious disease specialist, Dr. Olufemi Aboyeji, for additional review. Like Dr. Goldman, Dr. Aboyeji reviewed Bosley's medical records and claim documentation but never spoke with him or examined him in person. Dr. Aboyeji also similarly concluded that Bosley's medical records did not "support physical functional limitations beyond 11/01/2013 and continuing from an Infectious Diseases perspective," citing the absence of "physical findings that would be suggestive of the claimant having physical functional limitations due to chronic fatigue syndrome" (AR 139–49). Dr. Aboyeji further recited in his report the various "essential functions" of Bosley's position, including the ability to "work in a time-controlled environment while maintaining continuous and complex telephone interactions," "adapt to a continuously changing work flow," and "assess[] and triage[] patients via telephone" (AR 141). Additionally, after reviewing supplemental information from Dr. Wysham, Dr. Aboyeji submitted an addendum reaffirming his prior opinion because Dr. Wysham had only "reiterated what was previously noted in the medical records provided" (AR 104–10).

9

18.     In an undated letter following denial of Bosley's claim, Dr. Wysham asked MetLife to reconsider its decision, noting that Bosley had "obtained [a] diagnosis of fibromyalgia" and that the denial of long-term disability had caused him "financial hardship," putting him at risk of homelessness. Dr. Wysham further noted that Bosley had been "participating in his chronic fatigue and fibromyalgia treatment plan" and that she hoped he might "be able to return to work if he continues with his treatment plan." She concluded that "[d]enying [him] disability and causing him to become homeless [would] most certainly make his participation in therapy much more difficult and therefore cause ill-effects to his health" (AR 26). Bosley's attorney transmitted Dr. Wysham's letter to MetLife and requested reconsideration of its decision to deny his claim. MetLife affirmed its denial, reiterating that Bosley had not met the definition of disability under its policy.

## CONCLUSIONS OF LAW

### 1.     LEGAL FRAMEWORK.

ERISA provides claimants with a federal cause of action to recover benefits due under an ERISA plan. 29 U.S.C. 1132(a)(1)(B). Where, as here, disputed issues of material fact preclude summary judgment, the district court proceeds to a bench trial on the administrative record pursuant to FRCP 52. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999). Here, as stated, the parties have agreed to limit the trial record to the pretrial filings and Bosley's 2009, 2011, and 2014 long-term disability claim files.

### 2.     CLAIM FOR BENEFITS.

Also by agreement of the parties, MetLife's denial of Bosley's claim for benefits is subject to de novo review. This order therefore applies the policy terms to the evidence in the trial record without deference to either side's interpretation. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–13 (1989). It is undisputed that Bosley carried a diagnosis of chronic fatigue syndrome during the relevant time period. All agree, however, that the diagnosis alone is not sufficient to carry Bosley's burden to show entitlement to benefits. Rather, he must demonstrate by a preponderance of the evidence that his condition was in fact disabling under the terms of MetLife's policy. *See Muniz v. Amec Constr. Mgmt., Inc.*, 623

F.3d 1290, 1295–96 (9th Cir. 2010); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004), *overruled in part on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006).

Our court of appeals has recognized that "[t]here is no blood test or other objective laboratory test for chronic fatigue syndrome." The condition does not have a generally accepted "dipstick" test, and its standard diagnosis technique includes testing, comparing symptoms to a detailed Center for Disease Control list of symptoms, excluding other possible disorders, and reviewing thoroughly the patient's medical history. In short, chronic fatigue syndrome is a diagnosis of exclusion. *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 677 (9th Cir. 2011) (quoting *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir.1999)). Moreover, our court of appeals has held that mere absence of "objective physical findings" is insufficient to justify denial of benefits for chronic fatigue syndrome. *Id.* at 669, 677. In light of the foregoing parameters, the evidence on this record weighs in Bosley's favor.

*First*, as a previous order observed at the summary judgment stage, Bosley's own subjective reports of his struggle with chronic fatigue syndrome have remained consistent throughout the record and have been corroborated by the observations of his friends and coworkers. The letter submitted by Meeker, who worked in the same environment as Bosley, is particularly helpful because it offered insight into why his specific functional impairments render him unable to cope with the specific demands of his occupation. For example, she explains that, because of Bosley's low energy, he cannot maintain the "constant alertness and critical thinking" required to triage patients and "make instant life or death decisions regarding their care" (AR 194).

*Second*, Drs. Zollinger and Wysham, the only physicians to examine Bosley in person during the relevant time period, both concluded that his symptoms were in fact disabling. Both appeared to credit his self-reporting of his symptoms, including not only his subjective complaints but also specific indicia of fatigue. For example, Dr. Zollinger took note of how long Bosley needed to sleep, how much activity he could tolerate before needing to rest, and how any type of exertion negatively impacted his ability to function later on. Based on this

11

information and his own interactions with Bosley as his treating physician, Dr. Zollinger could have reasonably estimated Bosley's functional capabilities and made an informed decision as to his ability to perform in his occupation.

Similarly, Dr. Wysham reviewed Bosley's medical history, examined him in person, supervised his treatment, and concluded that his condition was in fact disabling. Significantly, she also spoke directly on the question of whether Bosley could perform his job duties as an advice nurse "with reasonable continuity." She explained that the job, although sedentary, was "high stress" and "a trigger for his disease." She further explained that, as Bosley "cares for patients during his job, the mental fatigue interferes with the ability [to] triage potentially critically ill patients" (AR 216). This explanation echoes Meeker's corroborating letter and goes directly to Bosley's inability to work as an advice nurse "in the usual and customary way."

*Third*, the contrary reports submitted by MetLife's physicians fail to tip the scales back in MetLife's favor. Dr. Peters disagreed with Dr. Zollinger's conclusions regarding Bosley's functional capabilities based primarily on the absence of "significant physical findings." His report suggested that "significant physical findings" would include, for example, severe daily headaches, abnormal musculoskeletal findings, heavy medication, inability to care for pets, or referrals for further treatment. But this premise does not hold up to scrutiny. As stated, our court of appeals has rejected the notion that "objective physical findings" are required to establish entitlement to benefits based on chronic fatigue syndrome. *See Salomaa*, 642 F.3d at 669, 677. Moreover, in his response to Dr. Peters, Dr. Zollinger specifically explained why he, as Bosley's treating physician, had decided against referrals for further treatment. Additionally, while Bosley did confirm that he cared for five dogs, he also indicated that just walking them to the back yard was "exhausting."

Furthermore, since Dr. Peters addressed only the "physical demand" of Bosley's job, he failed to rebut points made by Dr. Wysham and Meeker regarding how Bosley's particular condition rendered him unable to meet the specific non-physical demands of his occupation. Finally, given that Dr. Peters focused so much on the absence of specific clinical evidence concerning Bosley's functional capabilities, it seems odd that he nevertheless recommended

12

very specific accommodations — for example, two to three-minute rest periods every hour and a ten-pound limitation on lifting, carrying, pushing, or pulling — that would supposedly allow Bosley to work a full-time job. If Dr. Peters could opine so confidently about Bosley's functional capabilities based on the limited "physical findings" in his medical record, then surely Dr. Zollinger, Bosley's treating physician, could do the same and still credibly reach a dissenting conclusion.

The reports of Drs. Goldman and Aboyeji also present credibility issues. Each of them appeared to review Bosley's medical record only from the perspective of their respective specialties. In other words, Dr. Goldman specifically assessed Bosley's chronic fatigue syndrome from a psychiatric perspective and Dr. Aboyeji specifically assessed it from an infectious disease perspective. Neither approach seems well-justified given that chronic fatigue syndrome is a diagnosis not grounded in either psychiatry or infectious disease. For example, Dr. Aboyeji commented on the absence of evidence that Bosley's symptoms "related to Epstein-Barr virus or his history of infectious mononucleosis," but it is unclear why this should undermine his claim for benefits given that chronic fatigue syndrome is inherently a disease of unknown etiology. Similarly, Dr. Goldman's initial report commented, "there are no data in this record to support severe psychopathology or functional impairment as a result of a diagnosed mental disorder," suggesting that the absence of a mental disorder cut against Bosley's claim. Dr. Goldman's subsequent addendum, however, acknowledged that chronic fatigue syndrome is neither a mental illness nor a "psychiatric diagnosis," so it is unclear how Dr. Goldman's opinion actually comes to grips with Bosley's claim.

To be sure, certain weaknesses also appear in the opinions of Bosley's treating physicians. It remains particularly concerning that some of the record suggests those physicians, at least to some extent, uncritically accepted Bosley's subjective account of his symptoms without meaningful medical evaluation. For example, Dr. Wysham continued to support Bosley's claim for disability benefits even after the mental health evaluation she herself had required indicated that he had no interest in treatment and displayed low motivation for change. Additionally, her undated letter asking MetLife to reconsider its decision seemed to

13

rely, not on medical analysis, but on her belief that denying Bosley the financial resource of long-term disability benefits would be detrimental to his treatment plan. While these factors may be valid considerations for Dr. Wysham as a treating physician caring for her patient, they cannot substitute for evidence of actual disability under the terms of MetLife's policy.

On balance, however, this order concludes that the opinions of Bosley's treating physicians remain more credible and probative of the key issues in this case than the opinions of MetLife's medical director and physician consultants. The array of medical opinions in this record therefore weighs in Bosley's favor. *See also Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) ("On *de novo* review, a district court may, in conducting its independent evaluation of the evidence in the administrative record, take cognizance of the fact . . . that a given treating physician has 'a greater opportunity to know and observe the patient' than a physician retained by the plan administrator." (citation omitted)). This order further concludes that, considering the aforementioned opinions together with Bosley's subjective accounts of his symptoms and his friends' corroborations thereof, the preponderance of the evidence as a whole indicates that Bosley was in fact unable to perform with reasonable continuity the substantial and material acts necessary to pursue his usual occupation in the usual and customary way during the relevant claim period. He has therefore carried his burden to show entitlement to disability under the "own occupation" provision of MetLife's policy.

One of the key factors in Bosley's favor is that, despite the "sedentary" classification of his advise nurse position, all the relevant evidence in the record indicates it was actually a high-stress and high-stakes job for which someone with Bosley's constitution would be ill-suited. Bosley's inability to maintain energy and cope with stress would not only make the job difficult for him but also impair his ability to effectively assist patients calling in with their problems. Importantly, however, this is a unique consideration not categorically applicable to every job that Bosley may reasonably have been expected to perform satisfactorily in light of his age, education, training, experience, station in life, and physical and mental capacity. Moreover, neither Dr. Zollinger nor Dr. Wysham contemplated that Bosley would be disabled on a

14

permanent basis on account of his chronic fatigue syndrome. For example, Dr. Zollinger only ever extended Bosley's medical leave on a piecemeal basis, for approximately two to three months at a time. Dr. Wysham similarly granted Bosley medical leave only on the condition that he undergo continued treatment and try to improve his condition.

Once the unique demands of the advise nurse occupation are removed from the equation, and given that neither of Bosley's treating physicians opined that Bosley would be disabled on a long-term basis outside the context of that occupation, the record contains insufficient evidence to show that Bosley could not work in a different occupation after the elimination period plus 24 months. This order therefore concludes Bosley has not carried his burden to show by a preponderance of the evidence that he was entitled to long-term disability benefits under the "any occupation" provision of MetLife's policy.

**CONCLUSION**

For the foregoing reasons, plaintiff is entitled to payment of long-term disability benefits only under the "own occupation" provision of the defendant insurer's policy. The parties shall **MEET AND CONFER** regarding the appropriate amount of benefits in accordance with this order, and shall jointly submit a proposed form of judgment by **JUNE 20 AT NOON**. Plaintiff may move for attorney's fees and costs pursuant to the Civil Local Rules.

**IT IS SO ORDERED.**

Dated: June 13, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

15